**SEARS, ROEBUCK & CO.,
et al., Appellants,**

v.

**Lawrence E. MEADOWS, Appellee.**

No. 10–91–233–CV.

Court of Appeals of Texas,
Waco.

Jan. 27, 1993.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION ON REHEARING

VANCE, Justice.

In this appeal, we initially determine that a suit brought by Lawrence E. Meadows against Sears, Roebuck & Co. and Glenn Stranahan, an employee of Sears, arising out of Meadows' employment, is not preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C.A. §§ 1001–1461 (West 1985 & Supp.1992). Because we find no error, we will affirm the judgment.

Meadows' Fifth Amended Original Petition alleged that: he had been employed by Sears since 1956; in 1986 he was fraudulently induced to give up his position as an Area Department Manager at the Hancock Center store in Austin and take a sales clerk's position paying substantially less; he retired in 1987 under a plan offered by Sears to induce early retirement; and a release that he signed in connection with the early retire-

ment program should be rescinded, was without consideration, was against public policy, was obtained by Sears under duress, coercion, and undue influence, was not the proper release for the program under which he retired, was induced by the same fraud that induced him to change positions, and was not read to or by him. He further alleged that Sears breached its oral contract of employment with him, that he relied on Sears' policy not to terminate employees except for good cause, that Sears breached a duty of good faith and fair dealing, and that it intentionally inflicted emotional distress upon him. He asked for actual damages, punitive damages, and attorneys fees.

Sears pled that Meadows executed the release as part of "The Unit Closing Severance Allowance Plan for Timecard Regular Employees," a plan subject to and regulated by ERISA, that the release stood as a bar to all of Meadows' causes of action, that Meadows ratified the release by continuing to accept benefits under the Plan and in failing to tender the benefits back to Sears as a condition precedent to his claim for rescission of the release, and that Meadows' claims are preempted by ERISA.

By the release, signed on June 23, 1987, Meadows released Sears from "any and all actions, causes of action, damages or claims of damage of every character whatsoever" by reason of his employment. Thus, Meadows had no claim against Sears unless he could avoid the effects of the release.

The jury found that: (1) Sears failed to disclose to Meadows that there was no recommendation that he be fired, demoted, or disciplined, and that the failure to do so was fraud; (2) Sears and Meadows agreed that he would be demoted and that Sears would not terminate his employment; (3) the representation of Sears that the release was only a paper pertaining to his retirement that must be signed to obtain benefits under the Plan constituted fraud; (4) Sears and its employees had an agreement that Sears would treat its employees with "good faith and fair dealings"; (5) Sears breached the agreement;

and (6) Sears acted with malice toward Meadows. The jury failed to find that Meadows and Sears agreed that he would receive severance pay and retirement benefits in exchange for his agreement to retire or that they agreed to the terms of the release. The jury awarded damages of $221,050 for "loss of salary as Area Sales Manager from January 1, 1987, to January 1, 1997." It further awarded damages of $125,000 for mental anguish in the past and $250,000 for punitive damages.

In the judgment the court found that there was no consideration for the release, that Meadows received no benefit from it, and that the jury's answers on the questions about fraud "[vitiate] the General Waiver and Release and all matters tainted by the fraud." After disregarding the jury's finding that Sears and Meadows agreed that he would be demoted and that Sears would not terminate his employment, the court entered a judgment against Sears for $596,050 on August 12, 1991.

On September 5, Meadows filed a "tender and deposit" with the court, which alleged that he had been paid the sum of $10,784.80 by Sears at the time of his retirement. He further alleged that the jury had determined his damages for loss of salary to be $231,750 and deducted the sum of $10,700 (presumably ignoring the $84.80) to arrive at the award of $220,050. This assertion was supported by an affidavit of the foreman of the jury. Meadows stated, "I am now depositing and tendering into the Registry of the Court the sum of $84.80, which when taken with the sum of $10,700 that was deducted by the jury, represents the entire sum of $10,784.80 that was paid to me at the time of my retirement."

The leading authority on the question of ERISA preemption is *Ingersoll–Rand Company v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), where the Supreme Court held that an employee's suit for wrongful discharge, based on the contention that he was discharged only to avoid the vesting of his benefits,[1] was preempted by

1. The Texas Supreme Court had held that a cause of action for wrongful discharge would

exist as an exception to the employment-at-will doctrine when the principal reason for termi-

ERISA. *Id.*, at 137–45, 111 S.Ct. at 482–86. The Court grounded preemption on two theories: First, that the express provisions of the act "establish pension plan regulation as exclusively a federal concern." *Id.* at 138, 111 S.Ct. at 482. Second, that the claimed cause of action "conflicts directly with an ERISA cause of action"—termination of employment for the purpose of interfering with a participant's rights under a plan—that the Court found to be a "special feature" of the federal act that would preempt a state-law cause of action even in the absence of an express preemption provision. *Id.* at 142–43, 111 S.Ct. at 484–85.

Claims are preempted under the express provision if they "relate to" any employee benefit plan governed by ERISA. *Id.* at 137–38, 111 S.Ct. at 482. "The pre-emption clause is conspicuous for its breadth." *Id.* "State law" includes decisions having the effect of law; thus, common-law causes of action may be preempted. *Id.* at 137–40, 111 S.Ct. at 482–83. A state law may be preempted even if the law is not specifically designed to affect an ERISA plan, or if the effect is only indirect. *Id.* at 139–40, 111 S.Ct. at 483. Thus, the Court found that the existence of a pension plan was a critical factor in establishing liability for the wrongful discharge under state law and held that the cause of action was preempted. *Id.* at 139–40, 111 S.Ct. at 483–84.

In addition, claims may be preempted even in the absence of an express statutory provision. Although the mere existence of a federal regulatory or enforcement scheme—even a considerably detailed one—does not by itself imply preemption of state remedies, "special features" of such a scheme may warrant preemption. *Id.* at 143, 111 S.Ct. at 485. Because ERISA specifically prohibits an employer from discharging, fining, suspending, expelling, disciplining, or discriminating against a plan participant for exercising any right under the provisions of a plan, or for the purpose of interfering with the attainment of any right to which a participant may become entitled under a plan, the

Court found that a suit alleging a wrongful discharge to prevent vesting of benefits would be preempted because the activity was regulated by a "special feature" of the federal act. *Id.* at 144–45, 111 S.Ct. at 486.

▮ In a motion for rehearing citing several recent cases, Meadows asserts that the federal courts have not interpreted *Ingersoll–Rand* as expansively as we did on original submission. For example, in *Roney v. NationsBank Corp.* the United States District Court examined cases decided by the Fifth Circuit and concluded that the "inquiry . . . is whether Plaintiff's state court petition strikes at the core of the benefit plan itself—*i.e.*, its administration, and the type of benefits provided thereunder—or whether it involves a mere calculation of benefits in reference to the plan. In other words, would Plaintiff's causes of action cease to exist if stripped of their link to the pension plan." *Roney v. NationsBank Corp.*, 799 F.Supp. 670, 673 (N.D.Tex.1992). If the asserted cause of action attacks the structure, administration, or type of benefits provided—the core of the plan—it is preempted by ERISA and is exclusively federal; if, on the other hand, the cause of action exists independently of the benefit plan—even if it involves a calculation under a plan—the claim may be maintained in a state court. *Id.* Meadows' claims do not strike at the benefit plan at all. Although he must avoid the effects of the release that he signed when he retired, the release cannot be said to be "at the core of the benefit plan itself." *See id.* His claims of fraud exist independently of the plan and do not involve the structure, administration, or type of benefits provided by the plan. Although the determination of Meadows' damages may involve a calculation of benefits that he has received under the plan, we conclude that his claims do not "relate to" an employee-pension plan regulated by ERISA. *See Ingersoll–Rand*, 498 U.S. at 137–38, 111 S.Ct. at 482. We overrule Sears' point one.

In point two Sears contends that there is no evidence to support the jury's affirmative answer to the question inquiring whether

---

nation was to avoid vesting of pension benefits. *McClendon v. Ingersoll–Rand Company*, 779 S.W.2d 69 (Tex.1989), *rev'd*, 498 U.S. 133, 111

S.Ct. 478, 112 L.Ed.2d 474 (1990), *on remand*, 807 S.W.2d 577 (Tex.1991).

Sears' failure to disclose to Meadows that no one with Sears had recommended that he be fired, demoted, or disciplined constituted fraud. In point seven Sears contends that the court erred because the instruction accompanying question number one omitted an essential element of a cause of action for fraud, *i.e.*, Sears' intent to deceive or causing Meadows to act upon a materially false statement. We will first consider the point relating to the instruction.

 The elements of actionable fraud are: (1) that a material representation was made; (2) that it was false; (3) that when the speaker made it he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; and (6) that he suffered injury thereby. *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex.1977). Each of the elements must be established with a reasonable degree of certainty, and the absence of any one of them will prevent a recovery. *Custom Leasing, Inc. v. Texas Bank & Trust Co. of Dallas*, 516 S.W.2d 138, 143 (Tex.1974) (citing *Wilson v. Jones*, 45 S.W.2d 572 (Tex.Comm'n App. 1932, holding approved)). Intent to defraud and reliance by the other party may be established as a matter of law when the evidence is undisputed. *Custom Leasing Inc.*, 516 S.W.2d at 144. When, as here, the complaint is that the other party violated a "duty to speak," silence may be as misleading as a false representation. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986); *Smith v. National Resort Communities, Inc.*, 585 S.W.2d 655, 658 (Tex.1979).

The jury question asked:

Do you find from a preponderance of the evidence that the failure of Sears, if any, at the time and on the occasion in question, to disclose to Lawrence Meadows that no one in Sears Management had recommended that he be fired, or demoted, or that any disciplinary action be taken against him, constituted fraud as defined herein?

Answer: <u>Yes</u>

Fraud may consist of a positive representation or the concealment of an impor-

tant fact. It may be the suppression of the truth. It can consist of an undue advantage taken of a party under circumstances which mislead, confuse or disturb the just result of his judgment.

Under the Texas law for there to be fraud under this issue you must find that the information withheld was material; that Sears was under a duty to reveal the information; that Sears intentionally withheld the information or recklessly withheld without regard to the consequences; that the Plaintiff was not aware of the facts withheld; that the withholding caused the Plaintiff to act on a mistaken understanding of the facts; and that the Plaintiff was damaged by such withholding.

 Sears objected to jury question one on the grounds that it does not include the "element that Sears intended to cause the plaintiff to be mislead." Meadows points out that Sears did not tender a substantially-correct instruction. *See* TEX.R.CIV.P. 278. Because Meadows had the burden of proof on the issue, an objection that pointed out the matter objected to and the grounds for the complaint was sufficient. *See* TEX. R.CIV.P. 274, 278.

 An analysis of the instruction is helpful in determining whether it contained all of the elements of fraud. It required the jury to find:

- that the information withheld was material—satisfying the first element of fraud, *i.e.* that a material representation was made;

- that Sears was under a duty to reveal the information—satisfying the requirement that the "failure to speak" conveyed false information, the second element of fraud;

- that Sears intentionally withheld the information or recklessly withheld it without regard to the consequences—satisfying the third and fourth elements of fraud, *i.e.* that the speaker withheld material information recklessly and with the intention that his silence should be acted upon by the party;

- that the withholding caused the Plaintiff to act on a mistaken understanding of the facts—satisfying the fifth element of fraud, *i.e.* that the party acted in reliance upon it; and
- that Plaintiff was damaged by such withholding—satisfying the sixth element of fraud, *i.e.*, that he suffered injury thereby.

*See Stone*, 554 S.W.2d at 185. Thus, although the question could have more closely followed *Stone*, the court authorized the jury to answer the question affirmatively only if it found all six elements of fraud. *See id.* We overrule point seven.

■■■ Having determined that the instruction accompanying question number one was not erroneous, we must determine whether there is any evidence to support the jury's answer. In considering a "no-evidence" point, we must consider only the evidence and inferences tending to support the finding of the trier of fact and disregard all evidence and inferences to the contrary. *See Holt Atherton Industries, Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992). A no-evidence point can only be sustained when the record reveals one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or rules of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence established conclusively the opposite of a vital fact. *Juliette Fowler Homes, Inc. v. Welch Associates, Inc.*, 793 S.W.2d 660, 666 n. 9 (Tex.1990) (citing Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 TEX.L.REV. 361 (1960)).

■■■ Stranahan testified that, when he sent Meadows home, he told him that it was possible that he would be fired over the incident. Stranahan, as store manager, lacked the authority to fire Meadows, and the matter was never referred to anyone within Sears' administration who did have such authority. When Meadows called the store on four consecutive days to inquire about his status, he was given no information. When Meadows offered to take a lesser position, Stranahan did not tell him that he was not recommending that he be fired or demoted or that any disciplinary action be taken against him. The record contains evidence that there was an understanding between Sears and its employees that an employee would not be discharged without cause. Whether the circumstances were such as to create a duty to speak and the elements of intent, reliance, and damage were submitted to the jury and determined in Meadows' favor. Thus, we find more than a scintilla of evidence to support the jury's finding on question one. We overrule point two. *See id.*

In point three, Sears asserts that there is no evidence to support the jury's finding that a representation Sears made to Meadows about signing the release constituted fraud. Again, we must consider only the evidence and inferences tending to support the finding of the trier of fact and disregard all evidence and inferences to the contrary. *See id.* If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. *See id.*

The jury was asked:

Do you find from a preponderance of the evidence that the representations of Sears, if any, made to Lawrence Meadows, that the Waiver and Release was only a paper pertaining to his retirement and that he must sign it to receive his benefits under the Distressed Market Retirement Plan, constituted fraud as that term has been defined herein.

Answer: <u>Yes</u>

Under Texas law for there to be a fraud on a representation the jury must find that a material representation was made; that it was false; that when the maker made it he knew that it was false or it was recklessly made without any knowledge of the truth and as a positive assertion; that he made it with the intention that it should be acted upon by the party; that the party acted in reliance upon it and that he suffered injury.

■■■ Sears prepared the release as one of the documents it required an employee to sign to take advantage of the early-retirement plan. The document had far-reaching effects—it released Sears from each and ev-

ery claim that Meadows could have made against it arising prior to the date of the release. Meadows testified that he did not know that it was a release, that it was not read to him and he did not read it, and that he thought he was signing retirement papers.

Parties to a contract have an obligation to protect themselves by reading what they sign. *If no fraud is involved,* one who signs an agreement without knowledge of its contents is presumed to have consented to its terms and is charged with knowledge of the agreement's legal effect. *First City Mortg. Co. v. Gillis,* 694 S.W.2d 144, 147 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). It is undisputed that Meadows signed the release. It is undisputed that he was given an opportunity to read the release, but chose not to. It is undisputed that Meadows was told that the release was "only a paper pertaining to his retirement and that he must sign it to receive his benefits" under the retirement plan. Whether that amounted to fraud was a question for the jury—one that the jury resolved in Meadows' favor. Because the jury found fraud, Meadows cannot be said to have consented to the terms of the release nor can he be charged with knowledge of its legal effect. *See id.* Finding more than a scintilla of evidence to support the jury's finding, we overrule point three.

In point four, Sears asserts that there is no evidence to support the jury's answer to questions number three and four that an agreement existed between Sears and its employees that Sears would treat the employees with good faith and fair dealing and that Sears breached the covenant of good faith and fair dealing. Meadows directs us to cases involving insurance contracts, oil and gas leases, and other "special relationships." We agree with Sears that an implied covenant of good faith and fair dealing has never been recognized in Texas in the context of an employment relationship. *See Winograd v. Willis,* 789 S.W.2d 307, 312 (Tex.App.—Houston [14th Dist.] 1990, writ denied); *Hicks v. Baylor University Medical Center,* 789 S.W.2d 299, 303 (Tex.App.—Dallas 1990, writ denied). Although we find evidence in the record that it was understood by all its employees that Sears would not discharge an employee without cause, we find no evidence that a "special relationship" existed between Sears and Meadows or that Sears agreed to impose on itself a covenant of good faith and fair dealing. We sustain point four as to jury question three. Because there was no evidence to support a finding that an agreement of good faith and fair dealing existed between Sears and Meadows, we sustain point four as to jury question four.

In point five, Sears contends that the court should not have found as a matter of law that Meadows received no consideration for the release because the evidence established as a matter of law that he received consideration and that he ratified the release. In point six, Sears complains that, if ratification was not established as a matter of law, the court erred in failing to include a question on ratification in the charge. No question was submitted to the jury about consideration for or ratification of the release. In the judgment, the court found that Meadows received no benefits under the release and that there was no consideration for the release.

We believe that the evidence is undisputed that Meadows received no consideration for the release. The benefits that he received after signing the release as part of the documents required by Sears under the early retirement plan were the same benefits that he would have received had he not signed the release. In other words, signing the release added nothing to his benefits package. Sears points out that Meadows became aware of the release no later than August 1988, when he signed a verified pleading in this case. Thus, Sears says that by accepting benefits under the early retirement plan thereafter, Meadows ratified the release. Additionally, it says that he cannot continue to accept or retain benefits under the release and at the same time seek to rescind the release. Alternatively, Sears contends that the question of ratification should have been submitted to the jury. Sears tendered a proposed question on ratification, which the court did not include in its charge.

■ Ratification occurs when a person, induced by fraud to enter into an agreement, continues to accept benefits under that agreement after he becomes aware of the fraud, or if he conducts himself so as to recognize the agreement as binding. *Spangler v. Jones,* 797 S.W.2d 125, 131 (Tex. App.—Dallas 1990, writ denied). An intention to ratify is said to be the essence of a ratification. *United Parcel Service v. Helen of Troy Corp.,* 536 S.W.2d 415, 418 (Tex.Civ. App.—El Paso 1976, no writ), *overruled on other gds, Roark v. Stallworth Oil & Gas, Inc.,* 813 S.W.2d 492, 495 (Tex.1991).

■ We do not find evidence of a ratification of the release by Meadows that would have supported submission of an issue to the jury. At the time Meadows became aware of the release and its effects, this suit had been filed. At no time thereafter did he accept benefits *under the release,* recognize the agreement as valid, or act in a manner inconsistent with avoiding its effects. *See Spangler,* 797 S.W.2d at 131. We find no evidence that he intended to ratify the release. *See United Parcel Service,* 536 S.W.2d at 418. We overrule point five.

Question five asked the jury to find the amount of money required to compensate Meadows for his damages for loss of salary "as Area Sales Manager from January 1, 1987, until January 1, 1997," a ten-year period. In points eight and nine, Sears complains that there is no evidence to support the actual damages found by the jury because (a) there is no evidence that he was employed for a specific term, (b) he waived any damages incurred after his agreement to retire, and (c) the time period contained in the question does not conform to the evidence in the case. Additionally, Sears urges that the question constitutes a comment on the weight of the evidence. Meadows says that the 1997 date is justified because the undisputed evidence shows that he intended to retire at age 62.

■ We agree with Meadows. We believe that the use of the date January 1, 1997, as the end of the period during which Meadows could claim loss of salary as Area Sales Manager was a proper submission of a disputed fact issue to the jury, *i.e.,* the amount of damages resulting from the fraud. *See* TEX.R.CIV.P. 277. The use of the ending date, as an undisputed fact, does not constitute a comment on the weight of the evidence. *See Wiley v. Browning,* 670 S.W.2d 729, 733 (Tex.App.—Tyler 1984, no writ). The alternative would have been to allow the jury to speculate about how long Meadows might have continued as Area Sales Manager. We overrule points eight and nine.

Sears' point ten complains that the entry of a judgment for lost wages after June 23, 1987, the date of Meadows' retirement, constitutes a double recovery. The jury was asked to determine "what sum of money . . . , if now paid in cash," would compensate Meadows for his damages. Meadows testified that he had earned $49,836 as an area sales manager and $28,344 as a salesman, a difference of $21,492, and that he would have earned the additional $21,492 for eleven more years, or a total of $236,412. He further testified that he had received nine months of benefits at $518 per month, or $4,662, and that his claim for lost wages in the amount of $231,750 made an allowance for the $4,662 he had received. As we noted earlier, the jury deducted an additional $10,700 for the cash payment he received for twenty-six weeks severance pay and awarded the sum of $221,-050. Thus, all sums that he had received were credited by the jury in making its award. We overrule point ten.

Sears does not attack the jury's findings of mental anguish damages or punitive damages, nor does it attack Meadows' right to those damages based on the findings of fraud. Although we have found error under point four, that error does not appear to have caused the rendition of an improper judgment. *See* TEX.R.APP.P. 81(b)(1). Because the jury found that Sears had committed fraud against Meadows, he is entitled to the actual and punitive damages found by the jury. We affirm the judgment.

THOMAS, Chief Justice (concurring).

I concur in the opinion only because it implies that had Sears contractually imposed upon itself the duty of good faith and fair dealing that the company could have been

liable for punitive damages for a breach that contractually imposed duty. I continue to adhere to the view in my concurring and dissenting opinion in *Federal Exp. Corp. v. Dutschmann*, 838 S.W.2d 804, 813 (Tex. App.—Waco 1992, n.w.h.) (Thomas, C.J., concurring and dissenting), that exemplary damages cannot be awarded based on the breach of a contractually imposed duty.